**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Fabian ABARCA, Defendant–Appellant.**

**No. 03–1654.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 17, 2004.

Decided Jan. 13, 2005.

Bart Huff, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Joseph R. Lopez, Andrew M. Cohen, Chicago, IL, for Defendant–Appellant.

Before COFFEY, MANION, and ROVNER, Circuit Judges.

## ORDER

Fabian Abarca pleaded guilty to one count of distributing, and possessing with intent to distribute, just under five kilograms of cocaine, 21 U.S.C. § 841(a)(1), and was sentenced to 70 month's imprisonment. Abarca appeals his sentence, arguing that the court erred in finding him ineligible for the "safety valve." *See* U.S.S.G. §§ 5C1.2, 2D1.1(b)(6). We affirm.

On March 5, 2002, an informant arranged during several recorded telephone calls to meet with Jorge Castaneda the next day and purchase one kilogram of cocaine. The informant told Castaneda that if his "people" were satisfied with the cocaine's quality, he would want to buy at least three more kilograms.

At 7:30 the following evening, Castaneda and Octavio Flores arrived at the informant's business. DEA agents watched and recorded the meeting. Flores presented a brick-shaped package to the informant. After inspecting its contents the informant said he wanted "at least four more" that evening. Castaneda first telephoned Abarca and afterwards told the informant he would get "them." Castaneda arranged to telephone the informant in 30 to 40 minutes and departed with Flores. Surveillance agents followed. The brick was found to contain 998.6 grams of cocaine.

About an hour later surveillance agents saw Castaneda and Flores walk into grocery store. From there Castaneda called the informant and designated a nearby meeting place for the next delivery. Castaneda and Flores then exited with Abarca and walked toward Castaneda's car and a SUV parked beside it. Abarca opened the SUV's rear hatch, removed a red box and handed it to Castaneda. Castaneda put the box in his car and departed with

Flores. A few blocks from the designated meeting location, agents stopped Castaneda's car and found almost five kilograms of cocaine valued at approximately $80,000 in the red box.

The surveillance agents identified Abarca from the license plates on the SUV and went to his home to question him after arresting Castaneda and Flores. Abarca admitted having visited the grocery store that day, but denied having met anyone there. DEA agents did not again confront Abarca until they arrested him five months later.

After he pleaded guilty, Abarca gave a safety-valve proffer to DEA agents. On the day of the cocaine seizure, Abarca told the interviewers, he was working on a car for Castaneda at the auto shop where he was employed. Around noon that day, Castaneda visited the shop, but his car was not yet ready. Castaneda then disclosed to the unsuspecting Abarca that there were four kilograms of cocaine in Castaneda's car. Castaneda left without the cocaine, however, and around 6:00 p.m. called and asked Abarca to bring it to him. Abarca declined because he was busy closing the business. At around 7:30 p.m., Abarca received another request by telephone that he deliver the cocaine to Castaneda. This time Abarca agreed. Castaneda did not mention compensating Abarca during the phone call or at any time before. Abarca went back to his shop, retrieved the cocaine from Castaneda's car, and delivered it to Castaneda at the grocery store. At the store Castaneda promised to compensate Abarca, but did not specify a dollar amount. During the proffer, Abarca denied that he was the source of the drugs and stated that he did not know who the source was. He also denied prior involvement in any other drug dealing.

The government disbelieved Abarca and his story was not corroborated, so the probation officer found him ineligible for the safety valve. Still, the probation officer recommended acceptance points, see U.S.S.G. § 3E1.1, and against obstruction points, id. § 3C1.1, because Abarca's story had not been affirmatively disproved. Abarca objected to his ineligibility for the safety valve, claiming that he truthfully disclosed everything he knew about the offense.

At sentencing the government responded that three aspects of Abarca's story made no sense. First, the government argued, it is improbable that Castaneda would have left $80,000 worth of cocaine in the hands of his mechanic without any agreement about Abarca's role in guarding the drugs—Abarca might have stolen them or called law enforcement. Second, the government insisted, it is improbable that Castaneda would have left Abarca's shop at noon without his cocaine or a promise that Abarca would deliver it that night if necessary. Third, said the government, it could not be true that Abarca would have exposed himself to a prison term by transporting the cocaine without any prior assurance of compensation. The government theorized that Abarca was the source of the cocaine, which would explain why he retained possession of it all day and delivered it that evening.

Abarca did not testify at sentencing. Instead, his counsel replied to the government's argument by representing that Castaneda trusted Abarca to safeguard the drugs because Abarca had previously installed Castaneda's car stereo and knew, but did not care, that Castaneda was a drug dealer. Counsel opined that Castaneda probably meant to retrieve the drugs from Abarca's shop if the 7:30 p.m. meeting with the informant was productive and did not realize until after his 6:00 p.m.

phone call to Abarca that the shop would be closed. According to counsel, this was the reason that Castaneda left the cocaine at Abarca's shop instead of taking it with him at noon. Only when Castaneda discovered that he could not get the drugs any other way did he ask Abarca to deliver them. Abarca's counsel did not respond to the government's challenge that Abarca would not have undertaken the risk of transporting the drugs without some promise of compensation.

The court determined that Abarca was not entitled to the safety valve. The court did not believe that Castaneda would have left the cocaine with Abarca or that Abarca would have delivered it without advance agreement on his role in the offense. The judge did not affirmatively determine that Abarca was the source of the drugs, but commented that "if this were a civil trial, I would just have to throw my hands up and just say I really don't know what's going on." Thus, the court concluded, Abarca had failed to meet his burden of showing by a preponderance that he was eligible for the § 2D1.1(b)(6) reduction. However, the court agreed with the probation officer that Abarca should keep his acceptance points and not be penalized with points for obstruction of justice.

Because Abarca was in possession of at least 3.5 kilograms but less than 5 kilograms of cocaine, his base offense level was 30. *See* U.S.S.G. § 2D1.1(c)(5). With an adjusted offense level of 27 after acceptance points and a criminal history category of I, Abarca's guideline range was 70 to 87 months. Had the safety valve been applied, Abarca's total offense level would have been reduced by two to 25, *see* U.S.S.G. § 2D1.1(b)(6), resulting in a guideline range of 57 to 71 months. In addition, the safety valve would have exempted him from the minimum mandatory sentence of 60 months. 18 U.S.C. § 3553(f); 21 U.S.C. § 841(b)(1)(B)(ii)(II).

The safety valve exempts a drug defendant from the statutory minimum sentence and, depending on the base offense level, may reduce the defendant's offense level by two levels. 18 U.S.C. § 3553(f); U.S.S.G. §§ 5C1.2(a), 2D1.1(b)(6). The parties agree that Abarca met the first four criteria of the safety valve, so the sole issue on appeal is whether the district court erred in determining that Abarca failed to meet the fifth criterion. To establish the fifth criterion, a defendant must show that before sentencing he truthfully disclosed to the government all of the information he possessed concerning his offense or other offenses that were part of the same "course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2(a)(5). The defendant bears the burden of proving by a preponderance of the evidence that he is eligible for the safety valve. *See United States v. Ponce*, 358 F.3d 466, 468 (7th Cir.2004). A defendant fails to carry his burden if the government challenges the truthfulness, accuracy, or completeness of his statements and he produces "nothing to persuade the district court that his disclosures were truthful and complete." *United States v. Martinez*, 301 F.3d 860, 866 (7th Cir.2002). We review the district court's determination that a defendant has failed to meet his burden for clear error. *Id.*

We do not find clear error on this record. At sentencing the government challenged the truthfulness of Abarca's statements, yet Abarca presented no evidence to support his version of events. Abarca has given no reason to undermine the district court's credibility finding. Though we are unable to determine exactly what role Abarca played in the offense, it seems clear that he was more than a mere courier by happenstance, as he claimed in his

proffer. Having lied to the government during his proffer, he cannot now dispute the government's argument that he did not make a good-faith attempt to cooperate. *See United States v. Ramunno,* 133 F.3d 476, 482 (7th Cir.1998) (explaining that defendant "forfeited his opportunity to benefit from the Guidelines' safety valve" by lying to investigators).

Abarca argues that, because the government did not prove he was the source of the drugs, the district court was required to find that he satisfied the fifth criterion of the safety valve. Abarca's attempt to shift the burden to the government fails because it rests on the same argument we rejected in *United States v. Ramirez,* 94 F.3d 1095, 1100–01 (7th Cir.1996). The defendant bears the burden of persuading the court that his disclosure was truthful and complete. *Id.* at 1101. That burden becomes more onerous, not less, when the government challenges the defendant's assertion that his disclosures were truthful and complete. *See Martinez,* 301 F.3d at 866. The government was not required to prove that Abarca was lying. *Ramirez,* 94 F.3d at 1101. If the government had been able to do that, Abarca would have lost his acceptance points and might have been penalized with obstruction points. *See United States v. Wagner,* 996 F.2d 906, 915 (7th Cir.1993); *United States v. Banks,* 964 F.2d 687, 693 (7th Cir.1992).

AFFIRMED.